2012 ND 62

**In the Matter of the ESTATE OF Edith HARMS, Deceased.**

**William McNamara, as co-personal representative of the Estate of Edith Harms, Petitioner and Appellant,**

**v.**

**Cheryl Harms Feist, as co-personal representative of the Estate of Edith Harms, Respondent and Appellee.**

No. 20110165.

Supreme Court of North Dakota.

March 19, 2012.

Rehearing Denied May 7, 2012.

Lawrence A. Dopson (argued), Bismarck, ND, for petitioner and appellant.

Zachary Evan Pelham (argued) and Patrick W. Durick (appeared), Bismarck, ND, for respondent and appellee.

Crothers, Justice.

[¶ 1]   William McNamara appeals a district court order distributing the undistributed assets of the estate of Edith Harms. The district court determined Edith Harms' will required the undistributed as-

sets be distributed to the estate of Arne Harms. William McNamara argues the district court erred by considering the terms of the will because a prior agreement controlled. Alternatively, William McNamara argues the district court's interpretation of Edith Harms' will was erroneous. He argues the will directs the undistributed assets be distributed to the Edith Harms testamentary trust. We conclude the district court correctly determined the prior agreement did not control but erred in its interpretation of Edith Harms' will. We reverse and remand for further proceedings.

## I

[¶ 2] Edith Harms was married to Arne Harms. They had a daughter, Cheryl Feist. Edith Harms also had two sons from a previous marriage, Thomas and William McNamara. In 1995, Edith Harms executed a will with the following provision:

### ITEM V

"I give, devise and bequeath all the rest, residue and remainder of my property of every kind and description (including lapsed legacies and devises), wherever situate and whether acquired before or after the execution of this Will as follows:

"(1) *Creation of Share A and Trust B.* If my husband, Arne Harms, shall survive me, my personal representative shall divide my residuary estate into Two (2) separate shares, hereinafter designated as Share 'A' and Trust 'B'. Share A shall be composed of that fraction of my residuary estate (undiminished by any estate, inheritance, succession, death or similar taxes) determined as follows: the numerator of the fraction shall be the maximum marital deduction as finally determined in my federal estate tax proceedings, less the aggregate amount of marital deductions (if any) allowed for such tax purposes by reason of property or interests in property passing or which have passed to my husband otherwise than pursuant to the provisions of this Item; provided, however, the numerator for Share A shall be reduced by the amount, if any, needed to increase my taxable estate (for federal estate tax purposes) to the largest amount that, after allowing for the unified credit against the federal estate tax, and the state death tax credit against such tax (but only to the extent that the use of such state death tax credit does not increase the death tax payable to any state), will result in the smallest, if any, federal estate tax being imposed on my estate. The denominator of the fraction shall be the value of my residuary estate as finally determined in my estate tax proceedings. The term 'maximum marital deduction' shall not be construed as a direction by me to exercise any election respecting the deduction of estate administration expenses, the determination of the estate tax valuation date, or any other tax election which may be available under any tax laws, only in such manner as will result in a larger allowable estate tax marital deduction than if the contrary election had been made. In no event, however, shall there be included in the marital fraction any asset or the proceeds of any asset which will not qualify for the federal estate tax marital deduction and the marital fraction shall be reduced to the extent that it cannot be created with such qualifying assets. Such non-qualifying asset shall be allocated to Trust B and the marital fraction shall be created from my residuary estate less the non-qualifying asset. Share A shall be paid over and distributed to my husband and

Trust B shall be the balance of my residuary estate.

"(2) If my husband shall not survive me, Trust B shall be my entire residuary estate."

The will named Arne Harms the lifetime income beneficiary of "Trust B" and directed the trust be distributed to Cheryl Feist and Thomas and William McNamara after Arne Harms' death.

[¶ 3] Edith Harms died in 2001. Arne Harms was appointed personal representative of her estate, and her will was admitted to informal probate. On August 16, 2001, Arne Harms, as personal representative of the Edith Harms estate, conveyed a number of acres of real property from the Edith Harms estate to himself. On August 29, 2001, Arne Harms notified Cheryl Feist and Thomas and William McNamara of his intent to distribute to himself "all right, title and interest in and to all of the rest, residue and remainder" of the Edith Harms estate. Thomas McNamara objected to the proposed distribution, arguing that some of the real property Arne Harms conveyed to himself should be transferred to the Edith Harms testamentary trust, described as "Trust B" in Edith Harms' will.

[¶ 4] In August 2002, Arne Harms signed an amended notice of proposed distribution which provided:

"YOU ARE HEREBY NOTIFIED that the personal representative proposes to distribute the estate in the following manner:

TO: ARNE HARMS, all property that he owned jointly with Edith Harms, or of which he was a named beneficiary.

TO: CHERYL FEIST, [life insurance policy] on Arne Harms, by virtue of her contingent ownership in such policy.

TO: CHERYL FEIST AND THOMAS MCNAMARA AS CO-TRUSTEE OF THE EDITH HARMS TESTAMENTARY TRUST all right, title and interest in and to all of the rest, residue and remainder of said estate."

On the same day Arne Harms signed the amended notice, he conveyed a number of the acres of real property he previously had conveyed to himself to the Edith Harms testamentary trust. In December 2003, the amended notice was served on Cheryl Feist and Thomas and William McNamara and filed in the McKenzie County district court.

[¶ 5] Arne Harms and Thomas McNamara died before the Edith Harms estate was closed. In November 2010, William McNamara and Cheryl Feist were appointed co-personal representatives of the Edith Harms estate. In February 2011, William McNamara petitioned the district court for distribution of the undistributed estate assets. The undistributed assets included Edith Harms' one-half interest in approximately 75 mineral acres in sections 4 and 9, township 152 north, range 93 west and in section 34, township 153 north, range 93 west and the estate checking account balance of approximately $30,000. The mineral rights, which were not included in the inventory of the Edith Harms estate, had been discovered in litigation over the Edith Harms estate. The money in the checking account was a bonus payment for leasing the mineral rights.

[¶ 6] William McNamara asserted the undistributed assets should be distributed to the Edith Harms testamentary trust. William McNamara argued that Cheryl Feist waived any contrary argument regarding distribution of estate assets by accepting the amended notice of proposed distribution executed by Arne Harms and that Cheryl Feist was judicially estopped from arguing for an alternative distribu-

tion of the undistributed assets. Alternatively, William McNamara argued the undistributed assets should pass to the trust under Edith Harms' will. Cheryl Feist asserted she was not bound by the amended notice of proposed distribution and argued Edith Harms' will directed the undistributed assets pass to Arne Harms. The district court concluded waiver and judicial estoppel did not apply. The district court further concluded Edith Harms devised the undistributed assets to Arne Harms and ordered William McNamara and Cheryl Feist to convey the undistributed assets to the estate of Arne Harms.

## II

[¶ 7] William McNamara advances three arguments supporting his position that, as a matter of law, Cheryl Feist was required to distribute the undistributed assets under the terms of the amended notice of proposed distribution. Cheryl Feist responds the amended notice did not prevent her from arguing for distribution of the undistributed assets under the terms of Edith Harms' will. We "review[ ] questions of law de novo." *Estate of Eggl*, 2010 ND 104, ¶ 10, 783 N.W.2d 36 (quotation omitted).

## A

[¶ 8] William McNamara argues that by accepting property deeds as co-trustee of the Edith Harms testamentary trust and by continuing to administer the trust, Cheryl Feist accepted the terms of the amended notice of proposed distribution, thereby waiving any right to argue for an alternative distribution.

"A waiver occurs when a person voluntarily and intentionally relinquishes a known right or privilege. Waiver may be established either by an express agreement or by inference from acts or conduct. The existence of waiver gener-

ally is a question of fact, but if circumstances of an alleged waiver are admitted or clearly established and reasonable persons can draw only one conclusion from those circumstances, the existence of waiver is a question of law."

*Pfeifle v. Tanabe*, 2000 ND 219, ¶ 18, 620 N.W.2d 167 (internal citations omitted).

[¶ 9] William McNamara does not argue the district court's finding that waiver did not apply was clearly erroneous. *See First Int'l Bank & Trust v. Peterson*, 2009 ND 207, ¶ 13, 776 N.W.2d 543. Rather, he argues Cheryl Feist's actions resulted in an implied waiver as a matter of law. After Thomas McNamara objected to the original proposed distribution, Arne Harms executed the amended notice of proposed distribution and transferred a number of acres of real property to the Edith Harms testamentary trust. Edith Harms' will named Cheryl Feist and Thomas McNamara co-trustees of the trust. William McNamara relies solely on Cheryl Feist's role as co-trustee to support his argument that she waived any right to object to distribution of the undistributed assets according to the amended notice. Cheryl Feist disputes her act of accepting deeds in the capacity of a co-trustee waived her personal claims in this case. We agree that standing alone, Cheryl Feist's conduct as co-trustee of the Edith Harms testamentary trust is insufficient to establish waiver as a matter of law. *See Matter of Peterson's Dogs*, 2008 ND 225, ¶¶ 8–10, 758 N.W.2d 749 (stating waiver is generally a question of fact and concluding the district court erred by finding waiver without holding a hearing to consider the facts).

## B

[¶ 10] William McNamara argues Cheryl Feist was judicially estopped from arguing the assets remaining in the

Edith Harms estate should be distributed to the estate of Arne Harms. Judicial estoppel is a doctrine designed to protect the integrity of the judicial process by "prohibit[ing] a party from assuming inconsistent or contradictory positions during the course of litigation." *Meide v. Stenehjem*, 2002 ND 128, ¶ 15, 649 N.W.2d 532 (quoting *BTA Oil Producers v. MDU Resources Group*, 2002 ND 55, ¶ 14, 642 N.W.2d 873). While recognizing there is not "an exhaustive formula for determining the applicability of judicial estoppel," we have relied on factors outlined by the United States Supreme Court to determine whether the doctrine applies:

> "First, a party's later position must be 'clearly inconsistent' with its earlier position.... Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled,'.... Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' ... and thus poses little threat to judicial integrity.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped...."

*Meide*, at ¶ 13 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

[¶ 11] William McNamara argues Cheryl Feist was judicially estopped from arguing for distribution of the remaining assets under Edith Harms' will because Cheryl Feist agreed to the amended notice of proposed distribution. Based on this record, we do not know why Arne Harms executed the amended notice or what part, if any, Cheryl Feist had in its execution. However, we need not determine whether Cheryl Feist took the position that Edith Harms' estate should be distributed under the amended notice because the amended notice was not accepted by a court. Litigating parties are entitled to seek alternative forms of relief. *See* N.D.R.Civ.P. 8(e)(2)–(3). Judicial estoppel usually will not be recognized until a court accepts one of those alternatives. The amended notice did not give rise to inconsistent court determinations because it was not a judicial decision. Therefore, Cheryl Feist was not judicially estopped from arguing for distribution of the undistributed assets under Edith Harms' will.

C

[¶ 12] William McNamara argues the amended notice of proposed distribution was a binding family settlement agreement. The North Dakota Uniform Probate Code makes certain agreements among successors binding on an estate's personal representative and provides a procedure for making compromise agreements binding by securing court approval. N.D.C.C. §§ 30.1–20–12 and 30.1–22–01 to 30.1–22–02. Our law recognizes the contractual nature of certain agreements settling estate disputes between family members. *See Johnson v. Tomlinson*, 160 N.W.2d 49 (N.D.1968); *Muller v. Sprenger*, 105 N.W.2d 433 (N.D.1960); *Zimmerman v. Kitzan*, 65 N.W.2d 462 (N.D.1954); *Muhlhauser v. Becker*, 76 N.D. 402, 37 N.W.2d 352 (1948).

[¶ 13] No argument was made in the district court that the amended notice of proposed distribution was a contractual settlement agreement. "We only consider issues that were first presented to the district court, and, 'if a party fails to properly raise an issue or argument before the

district court, the party is precluded from raising that issue or argument on appeal.'" *Matter of Hirsch Trust*, 2009 ND 135, ¶ 12, 770 N.W.2d 225 (quotation and internal citation omitted). Because the question of whether the amended notice of proposed distribution was a family settlement agreement has not been raised before, we will not consider the issue on appeal.

## III

[¶ 14] William McNamara argues the district court erred by determining Edith Harms devised the undistributed assets to Arne Harms. When the meaning of a will provision is in question, "[t]he intention of a testator as expressed in the testator's will controls the legal effect of the testator's dispositions." N.D.C.C. § 30.1–09–03. "The testator's intent is determined from the language of the will if the language of the will is clear and unambiguous." *Ruud v. Frandson*, 2005 ND 174, ¶ 6, 704 N.W.2d 852 (internal quotation omitted). "Technical words used in a will should be construed according to their technical meaning by reference to their technical context, unless a contrary intention is plainly expressed in the will." *Estate of Brown*, 1997 ND 11, ¶ 17, 559 N.W.2d 818. "A will provision is ambiguous if it can be given more than one interpretation or understood in more than one sense." *Ruud*, at ¶ 6 (quotation omitted). "Whether an ambiguity exists in a will is a question of law for this [C]ourt to decide." *Id.* (quotation omitted). "We decide for ourselves the construction of an unambiguous will." *Id.* (quotation omitted).

[¶ 15] Item V of Edith Harms' will, reproduced above, controls distribution of the undistributed assets. When interpreting Item V, the district court determined the question before it was "whether the clause would operate to first fund the marital gift up to $675,000 (Share A) with the excess to the trust (Trust B), or alternatively first fund Trust B to a maximum of $675,000 with any remaining assets to Share A." The district court answered that question by finding "that the language was a formula pecuniary bequest designed to take maximum use of the [$675,000] unified estate and gift tax credit." The district court found the formula "directed that the property would go first to Share A (to her husband), with the balance of the residuary estate going to Trust B (Edith Harms Testamentary Trust)." The district court further found, "As that threshold ($675,000 in 2001) was not met with the property of the Estate, there would be no balance left over to transfer into the Testamentary Trust."

[¶ 16] We conclude the district court's interpretation of Item V was erroneous. The district court correctly found the provision was designed to maximize use of Edith Harms' unified credit. However, the district court erred by finding this could be accomplished either by transferring property to "Share A" or by transferring property to "Trust B." Edith Harms could only optimize her unified credit by transferring property to "Trust B." Therefore, contrary to the district court's finding, the provision directed that assets valued in the amount of Edith Harms' available unified credit be transferred to "Trust B" before any assets were transferred to "Share A."

[¶ 17] Explaining the construction of Item V requires discussion of the estate tax marital deduction and the unified credit against estate and gift tax. The estate tax marital deduction allows spouses to avoid paying estate taxes on property passing from a decedent to his or her surviving spouse. 26 U.S.C. § 2056. Before 1981, the value of property that could be transferred under the marital deduction was limited. Amy Morris Hess, George

Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 275.10, at 402–05 (3d ed.2005). The Economic Recovery Tax Act of 1981 removed all quantitative limitations on the marital deduction, creating an unlimited marital deduction that allowed spouses to defer all tax on property transferred between them until the death of the surviving spouse. *Id.* at 406.

[¶ 18] The unified credit against the federal estate tax was introduced in 1976. Tax Reform Act of 1976, Pub.L. No. 94–455, § 2001, 90 Stat. 1520, 1848 ·(1976) (current version at 26 U.S.C. § 2010).

> "Under prior law, there was significant disparity between the tax treatment of lifetime transfers and transfers at death, which made lifetime transfers advantageous. The gift and estate tax rate schedules were separate with the gift tax rates approximately three-quarters of the estate tax rates.... However, in 1976 Congress reduced the disparity between lifetime transfers and transfers at death by adopting a single unified estate and gift tax schedule providing for progressive rates based upon cumulative lifetime transfers and transfers at death."

Hess, *supra,* § 271, at 171. The unified credit "is first used against gift taxes, and any unused portion of the credit is then applied against the estate tax." 47B C.J.S. *Internal Revenue* § 500 (2012). "The credit is exhausted before any tax is due, and to the extent it is used against lifetime transfers, it is not available to reduce the estate tax." 10 Jacob Rabkin & Mark H. Johnson, *Current Legal Forms with Tax Analysis* § 7.02[2], at 7–104 (2011).

[¶ 19] The amount of the unified credit is governed by 26 U.S.C. § 2010 and has varied based on the year of the decedent's death. Beginning in 1997, 26 U.S.C. § 2010 described the unified credit in terms of an "applicable credit amount" equal to the tentative estate and gift tax on the "applicable exclusion amount." Taxpayer Relief Act of 1997, Pub.L. No. 105–34, § 501, 111 Stat. 788, 845 (1997) (current version at 26 U.S.C. § 2010(c)). The "applicable exclusion amount" is the value of combined lifetime and at death transfers an individual can exempt from the federal estate and gift tax. 26 U.S.C. § 2010(c).

[¶ 20] For decedent's dying in 2001, the applicable credit amount of $220,550 exempted the applicable exclusion amount of up to $675,000 of transfers from taxation. Taxpayer Relief Act of 1997, Pub.L. No. 105–34, § 501, 111 Stat. 788, 845 (1997) (current version at 26 U.S.C. § 2010(c)); 34A Am.Jur.2d *Federal Taxation* ¶ 145,102 (2012). In 2001, any unused portion of an individual's unified credit expired. *See* 34A Am.Jur.2d, *supra* ¶ 145,102 (discussing the 2011 introduction of the "deceased spousal unused exclusion amount"). Married couples could use their unified credits to minimize their combined estate tax liability by transferring property from the decedent spouse to individuals other than the surviving spouse. In the case of Edith and Arne Harms, this was accomplished by transferring estate assets to "Trust B." The "Trust B" assets avoided taxation in the estates of both Edith and Arne Harms, first at Edith Harms' death through use of her unified credit and next by passing to the trust beneficiaries rather than to Arne Harms' estate at Arne Harms' death.

[¶ 21] Estate planners developed two basic formulas to optimize use of the marital deduction and the unified credit. Hess, *supra,* § 275.10, at 463–66; Rabkin, *supra,* §§ 7.48[5], at 7–267; 7.112, at 7–556 to 7–557. Both formulas divide a specified asset pool between a marital share which qualifies for the marital deduction and a nonmarital share which uses the unified

credit. Rabkin, *supra,* §§ 7.48[5]; 7.112. A pecuniary formula expresses the marital share "in terms of a specific dollar amount of property equal to the maximum marital deduction." Hess, *supra,* § 275.10, at 463. A fractional formula expresses the marital share "in terms of a designated fraction or percentage portion" entitling the surviving spouse to a fraction of each asset against which the fraction applies. *Id.* § 275.10, at 465. Both types of formulas have the same purpose:

> "A formula gift is [ ] used to take full advantage of the decedent's unified credit, placing the amount sheltered by the credit in trust or making some other disposition which will cause this sheltered amount to avoid tax in the estate of the surviving spouse as well. Thus, a significant portion of the estate can escape estate tax altogether. The amount which is not sheltered by the unified credit is included in a marital deduction bequest, thus deferring all estate tax until the death of the surviving spouse."

*Id.* § 275.10, at 466.

[¶ 22]  Item V of Edith Harms' will is a fractional formula dividing her residuary estate between a marital "Share A" and a nonmarital "Trust B." We conclude the formula unambiguously funds "Trust B" to the extent Edith Harms' applicable exclusion amount was available to offset federal estate taxes on her residuary estate. "Share A" is funded, if at all, to the extent the value of Edith Harms' residuary estate exceeded the value of her available applicable exclusion amount.

[¶ 23]  The formula optimizes use of the marital deduction and Edith Harms' unified credit by describing the "Share A" fraction and distributing the balance of the residuary estate to "Trust B." The first term of the numerator of "Share A" is the "maximum marital deduction" less "the aggregate amount of marital deductions … which have passed to my husband otherwise than pursuant to the provisions of this Item[.]" The marital deduction term funds "Share A" with the maximum amount of assets qualifying for the marital deduction without exceeding the value of the marital deduction. Because the unlimited marital deduction was in effect when Edith Harms died, the marital deduction term places her entire residuary estate in the numerator of "Share A."

[¶ 24]  After the entire residuary estate is placed in the numerator, it is "reduced by the amount, if any, needed to increase my taxable estate (for federal estate tax purposes) to the largest amount that, after allowing for [the unified credit and the state death tax credit], will result in the smallest, if any, federal estate tax being imposed on my estate." The reduction of the amount allowed for the "unified credit against the federal estate tax" decreases the numerator of "Share A" by the available portion of Edith Harms' $675,000 applicable exclusion amount, effectively transferring assets valued in that amount from the numerator of "Share A" to "Trust B."

[¶ 25]  The reduction of the amount allowed for the "state death tax credit" against the federal estate tax has no effect on the distribution of Edith Harms' residuary estate. The federal credit for state death taxes allowed decedents dying before 2005 to claim a federal estate tax credit for a specified amount of state death taxes actually paid to a state. 26 U.S.C. § 2011. Many states, including North Dakota, imposed estate taxes in an amount equal to the maximum allowable federal state death tax credit. N.D.C.C. § 57-37.1-04; Rabkin, *supra,* § 7.51, at 7-278.1. These "pickup" taxes allowed states to collect estate taxes from estates subject to federal estate tax without increasing an estate's total tax burden. Rabkin, *supra,*

§ 7.51, at 7–278.1. Because North Dakota's "pickup" tax conformed to the federal credit for state death taxes, no state estate tax was imposed unless the estate was subject to federal estate tax. The "state death tax credit" had no effect in this case because the formula in Edith Harms' will allowed her estate to avoid federal estate taxation through use of the marital deduction and the unified credit.

[¶ 26] To summarize, the numerator of "Share A" is Edith Harms' entire residuary estate reduced by the available portion of Edith Harms' $675,000 applicable exclusion amount. The denominator of "Share A" is Edith Harms' entire residuary estate. The portion of Edith Harms' residuary estate not included in "Share A" passes to "Trust B." Therefore, "Trust B" is funded by the assets not included in "Share A," equal to the available portion of Edith Harms' $675,000 applicable exclusion amount. "Share A" is funded, if at all, to the extent the value of Edith Harms' residuary estate exceeds the value of "Trust B."

[¶ 27] We are unable to determine the proper distribution of the undistributed assets because the record does not include the necessary values. The district court concluded the $675,000 threshold was not met with the property of the estate. However, from this record, it is not clear how the district court valued the residuary estate or if the district court determined whether any portion of Edith Harms' unified credit was exhausted against gift taxes or against estate assets passed outside of Edith Harms' residuary estate. We remand for the district court to determine the federal estate tax value of Edith Harms' residuary estate. In addition, the district court must determine what amount of Edith Harms' $675,000 applicable exclusion was available to be applied against federal estate taxes on her residuary es-

tate. After determining these values, the district court must determine the proper distribution of the undistributed assets. First, "Trust B" must be funded in the amount of Edith Harms' applicable exclusion available to be applied against her residuary estate. Next, "Share A" must be funded, if at all, to the extent the federal estate tax value of Edith Harms' residuary estate exceeds the value of Edith Harms' available applicable exclusion.

IV

[¶ 28] We reverse the district court order distributing the undistributed assets of the estate of Edith Harms and remand for further proceedings consistent with this opinion.

[¶ 29] GERALD W. VANDE WALLE, C.J., RONALD E. GOODMAN, S.J., and DALE V. SANDSTROM, JJ., concur.

[¶ 30] The Honorable RONALD E. GOODMAN, S.J., sitting in place of KAPSNER, J., disqualified, and the Honorable MARY MUEHLEN MARING disqualified herself subsequent to oral argument and did not participate in this decision.